UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MECCA ALLAH SHAKUR, | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 3:07-cv-1239(CFD) |
| | : | |
| WARDEN SIEMINSKI, et al., | : | |
| Defendants. | : | |

## RULING ON MOTION FOR SUMMARY JUDGMENT

Plaintiff Mecca Allah Shakur ("Shakur"), also known as Ronnie Hinton,

commenced this civil rights action *pro se* and *in forma pauperis* against defendants

Warden Sieminski, Majors Lahda and Polce,[1] and Correctional Officers Duquette,

Frechette, Ouellette, Christian, Penfield, Pagan, Caron and Ortiz.  The claims relate to

Shakur's confinement at MacDougall-Walker Correctional Institution in Suffield,

Connecticut, from 2005-06.  Defendants move for summary judgment on all remaining

claims.  For the reasons that follow, the motion for summary judgment is granted.

## I.      Standard of Review

In a motion for summary judgment, the burden is on the moving party to

establish that there are no genuine issues of material fact in dispute and that it is

entitled to judgment as a matter of law.  *See* Rule 56(c), Fed. R. Civ. P.; *Anderson v.

Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  The moving party may satisfy this

burden "by showing–that is pointing out to the district court–that there is an absence of

evidence to support the nonmoving party's case."  *PepsiCo, Inc. v. Coca-Cola Co.*, 315

F.3d 101, 105 (2d Cir. 2002) (per curiam) (internal quotation marks and citations

---

[1]  All claims against defendant Polce were dismissed on May 8, 2008, when the court granted defendants' motion to dismiss in part.

omitted).  Once the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," *Anderson*, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor in order to defeat the motion for summary judgment.  *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).

When reviewing the record, the court resolves all ambiguities and draws all permissible factual inferences in favor of the party against whom summary judgment is sought.  *Patterson v. County of Oneida, NY*, 375 F.3d 206, 218 (2d Cir. 2004).  If there is any evidence in the record on a material issue from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is inappropriate. *Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).  However, "'[t]he mere of existence of a scintilla of evidence in support of the [plaintiff's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [plaintiff].'"  *Dawson v. County of Westchester*, 373 F.3d 265, 272 (2d Cir. 2004) (quoting *Anderson*, 477 U.S. at 252).

I.     Facts[2]

At the time of the incidents underlying the complaint, the defendants worked at MacDougall-Walker Correctional Institution ("MacDougall"):  defendant Sieminski was the warden; defendant Lahda was a major; defendants Ouellette, Caron, Frechette, Ortiz and Pagan were correctional officers; and defendants Christian, Duquette and Penfield were Control Unit Officers.  Defendants Lahda, Ouellette, Caron, Frechette, Ortiz, Pagan, Christian, Duquette and Penfield all were assigned to the second shift.

Correctional officers have duties relating to security, inmate control, administration and communication, such as performing periodic head counts, conducting periodic searches of all areas available to inmates, verifying and authorizing inmate movement into and out of the unit, maintaining records of inmate movement,

---

[2] The facts are taken from defendants' Local Rule 56(A)(1) Statement of Material Facts Not in Dispute [Doc. #64-4] and attached exhibits.  Although plaintiff filed a document entitled Plaintiff's Statement of Disputed Issues [Doc. #73 at 10-13], he has not complied with the requirements of the local rule.  *See* D. Conn. L. Civ. R. 56(a)2 ("The papers opposing a motion for summary judgment shall include a document entitled 'Local Rule 56(a)2 Statement,' which states in separately numbered paragraphs meeting the requirements of Local Rule 56(a)3 and corresponding to the paragraphs of the moving party's Local Rule 56(a)1 Statement whether each of the facts asserted by the moving party is admitted or denied") *and* 56(a)3 ("Each statement of material fact ... and each denial in an opponent's Local Rule 56(a)2 Statement [] must be followed by a specific citation to (1) the affidavit of a witness competent to testify to the facts at trial and/or (2) evidence that would be admissible at trial").  The rule cautions litigants that failure to comply with this "specific citation" requirement may result in the court deeming admitted properly supported facts in the movant's Local Rule 56(a)1 Statement.

Shakur fails to include the portion of the 56(a)2 statement admitting or denying each of defendants' facts.  Instead he refers the court to his declaration.  The declaration, however, does not mirror defendants' Local Rule 56(a)1 Statement, admit or deny each fact or include specific citations.  Shakur was on notice of this requirement.  *See* Doc. #64-23, Notice to Pro Se Litigant Opposing Motion for Summary Judgment as Required by Local Rule of Civil Procedure 56(b).  Thus, the court deems admitted the facts in defendants' Local Rule 56(a)1 Statement.  The court considers Shakur's declaration and supporting exhibits in opposition to the motion for summary judgment.

responding to emergency situations, escorting inmates and shaking down cells.  Control Unit Officers ensure that the housing unit runs according to schedule.  Their duties include monitoring cameras, opening and closing doors and completing log book entries.  They also ensure that a correctional officer is in the recreation yard to conduct pat down searches before recreation begins, announce the commencement and cancellation or end of recreation, and ensure that recreation is conducted according to schedule.

On June 15, 2005, Shakur received a disciplinary report for fighting at another correctional institution.  During his period of incarceration, Shakur has received 103 disciplinary reports.  After serving the disciplinary sanctions, correctional officials evaluated Shakur's classification and disciplinary history, including prior assaults on staff at the other correctional institution, and determined that he should be transferred to Q-Unit at MacDougall.  Q-Unit was used as a "step-down unit" for inmates discharged from Northern Correctional Institution (the highest security facility), administrative segregation, chronic discipline and security threat inmates, and as a transition unit for inmates completing disciplinary sanctions.  Inmates remain in Q-Unit for a probationary period of ninety days to enable staff to closely monitor their behavior and ensure positive adjustment to unit rules.

Inmates worked their way through the various "expansion" housing units, from Q to N, to O and finally P.  After completing this process (without receiving any disciplinary reports), inmates are transferred into the housing units in the main building at MacDougall.  Inmates in the main building do not wish to lose their housing assignments, and inmates in Units Q to P wish to attain the main building.

4

First occupied in 2003, all of the expansion units are newly constructed modern housing.  Inmates in Q-Unit receive the same meals, medical care and clothing as inmates in the main building at MacDougall.  The only difference is that inmates in Q-Unit eat in their cells and receive medical care in the unit.  Programs and religious services are provided within Q-Unit.  There is no evidence that Shakur was treated differently from the other inmates in Q-Unit.

Q-Unit cells measure 12' by 7.6' for a total area of 91.2 square feet, and are well-lit, well ventilated and heated.  Inmates can exercise in their cells by performing sit-ups, push-ups, calisthenics and other exercises.  They cannot exercise in the Q-Unit dayroom because of safety concerns.  Inmates can, though, walk around the perimeter of the dayroom, a 150' by 30' rectangle.

Inmates in Q-Unit, (if not on "confinement to quarters" status), are afforded recreation twice each weekday, one hour on first shift and another hour on second shift.  The approximately 100 inmates are divided into four groups, with one group allowed out for recreation at a time.  Q-Unit and R-Unit share a recreation yard that is between the two buildings.  Inmates in Q-Unit are afforded outdoor recreation, weather permitting, on odd-numbered days; inmates in R-Unit on even-numbered days.

The recreation yard is shaped like an equilateral triangle with sides approximately 40' long.  Inmates can run or walk around the perimeter or play basketball.  If the weather is cold, inmates are provided coats to go outdoors.  In the winter, snow and ice accumulate on the metal roofs of Q-Unit and R-Unit.  The snow and ice often melts during the day and slides off the roofs onto the recreation yard.  Certain inmates were assigned to remove the snow and ice from the yard during first

shift and to put salt on ice patches so the yard can be used.  If the snow and ice could not be removed or the temperature was too cold, outdoor recreation would be cancelled.

In addition, for safety and security reasons, at least five inmates were assembled to have outdoor recreation.  Staffing resources were limited, with only two correctional officers assigned to Q-Unit.  Thus, one of the correctional officers would not be assigned to outdoor recreation if, for example, only one inmate wished to go outdoors.

If outdoor recreation was cancelled, inmates were allowed to recreate in the unit. They could walk around the perimeter of the dayroom or play table games.  For safety reasons, inmates were not allowed to do vigorous exercises in the dayroom.  During recreation periods, inmates also used the telephone and showered.  Only correctional officer supervisors were authorized to cancel recreation or recall inmates early from recreation.

On August 11, 2006, Captain Frey, the unit manager for Q-Unit, assigned Shakur a job in the unit as a "tierman."  To perform his general janitorial and other housecleaning duties, Shakur was allowed out of his cell for approximately four hours on first shift and another four hours on second shift.

When an emergency situation arises and a "code" is called, all inmates at MacDougall must return to their cells and close and secure their cell doors.  Depending on the type of emergency, all correctional staff may be required to report to assist in the emergency.  Thus, all inmates, even in areas not directly affected by the emergency, must be secured in their cells for safety reasons.

**III.     Discussion**

Shakur asserts four main federal constitutional claims:  (1) Eighth and

Fourteenth Amendment claims for wrongful excessive confinement in Q-Unit, (2) Eighth

Amendment claim for restrictions on physical exercise, (3) Eighth Amendment claim for

excessive lockdowns, and (4) Eighth and Fourteenth Amendment claims for denial of

contact visits.  On May 8, 2008, the court granted defendants' motion to dismiss the

claims for denial of contact visits, lockdowns and denial of due process in connection

with assignment to Q-Unit.  Defendants now move for summary judgment on the

remaining Eighth Amendment claim concerning the conditions of confinement in Q-Unit,

including restrictions on exercise or outdoor recreation.

**A.     Eighth Amendment Claim**

It is undisputed that the treatment a prisoner receives in prison and the

conditions under which he is confined are subject to scrutiny under the Eighth

Amendment.  *See Helling v. McKinney*, 509 U.S. 25, 31 (1993); *see also Rhodes v.*

*Chapman*, 452 U.S. 337, 351 (1981).  To state an Eighth Amendment claim, an inmate

must allege facts demonstrating failure of prison officials to provide for inmates' "basic

human needs - e.g., food, clothing, shelter, medical care, and reasonable safety."

*DeShaney v. Winnebago County Dept. of Social Servs.*, 489 U.S. 189, 200 (1989).

An inmate may prevail on an Eighth Amendment claim "only where he proves

both an objective element–that the prison officials' transgression was 'sufficiently

serious'–and a subjective element–that the officials acted, or omitted to act, with a

'sufficiently culpable state of mind,' i.e., with 'deliberate indifference to inmate health or

7

safety.'" *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  The objective element is satisfied where the inmate shows that the deprivation he alleges is sufficiently serious, i.e., that his confinement under the alleged conditions violates contemporary standards of decency. The subjective element requires the inmate to show that correctional officials were aware of and disregarded a substantial risk of serious harm.  *See id.* at 185-86. Defendants "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and ... must also draw that inference."  *Farmer*, 511 U.S. at 837.

### 1.    Denial of Recreation

Both the Supreme Court and the Court of Appeals for the Second Circuit recognize exercise as a basic human need that must be provided for inmates.  *See Wilson v. Seiter*, 501 U.S. 294, 304-05 (1991); *Williams v. Greifinger*, 97 F.3d 699, 704 (2d Cir. 1996); *Sostre v. McGinnis*, 442 F.2d 178, 193 & n.25 (2d Cir. 1971) (en banc), *cert. denied*, 404 U.S. 1049 (1972).  Restrictions on exercise should not be "routine." They must be limited to unusual circumstances or situations where restrictions are needed for disciplinary reasons.  *See Hope v. Pelzer*, 536 U.S. 730, 737 (2002) (noting that penological concerns may be considered in reviewing an Eighth Amendment claim).

While courts have found that denial of all opportunity to exercise violates an inmate's constitutional rights, they have found no violation where the inmate has an opportunity for exercise, either in or outside of his cell.  *See Williams*, 97 F.3d at 703-05

8

(holding that segregated confinement for long periods does not violate Eighth Amendment if inmate is provided opportunity for exercise) (citations omitted); *Sostre*, 442 F.2d at 186, 193 & n.25 (noting that denial of all opportunity for exercise constitutes Eighth Amendment violation but distinguishing this case because plaintiff was afforded opportunity to exercise for one hour each day with four or five other prisoners in a small, enclosed yard, open to the sky); *Morgan v. Rowland*, No. 3:01cv1107(CFD), 2006 WL 695813, at *7-8 (D. Conn. Mar. 17, 2006) (finding no constitutional violation where inmate required to participate in outdoor recreation in full restraints because inmate could walk about while restrained and could exercise in his cell).  In addition, there is no constitutional right to outdoor recreation.  *See, e.g., Walker v. Jackson*, No. 5:08cv147-JMR, 2009 WL 1768547 at *1 (S.D. Miss. June 23, 2009)(citing *Green v. Ferrel*, 801 F.2d 765, 771-72 (5th Cir. 1986)).

To state a cognizable Eighth Amendment claim for denial of recreation, Shakur must show that the denial of the opportunity for exercise resulted in tangible physical harm and that the restriction was not the result of any legitimate penological goal such as inmate or staff safety or maintenance of the facility.  *See Thomas v. Ramos*, 130 F.3d 754, 763 (7th Cir. 1997); *Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir. 1979).  The court considers factors including the duration and extent of the deprivation, the availability of other out-of-cell activities, the opportunity for in-cell exercise and the reason for the deprivation.  *Williams v. Goord*, 142 F. Supp. 2d 416, 425 (S.D.N.Y. 2001).

Shakur states in his declaration that he was afforded outdoor exercise on odd-numbered days, weather permitting, and was not permitted to use the gymnasium on

the alternate days.  He further states that the defendants shortened the exercise periods by five or ten minutes, and that no outdoor exercise was permitted for more than two months during one winter because the defendants refused to permit inmates to shovel the exercise yard.  Also, inmates were recalled from recreation whenever a code was called and, sometimes, inmates were not allowed to return to recreation when the code cleared.

Defendants have provided a copy of the Q-Unit recreation schedule which provides for two hours of recreation per day.  Shakur has named as defendants only officers on the second shift.  Thus, the court assumes that Shakur asserts no complaints regarding his recreational opportunities on first shift.

Shakur contends that the defendants often shortened the recreation period on second shift by five or ten minutes.  This claim is not of constitutional magnitude.  Even assuming that the second shift recreation period were shortened by ten minutes every day, Shakur still would receive 1 hour, 50 minutes of recreation time per day.  Although the Second Circuit has approved one hour of outdoor recreation per day, it has not held that amount to be the constitutional minimum.  *See Anderson v. Coughlin*, 757 F.2d 33, 35 (2d Cir. 1985); *Davidson v. Coughlin*, 968 F. Supp. 121, 130 (S.D.N.Y. 1997) (acknowledging that no court has set a constitutional minimum for exercise).

Defendants provide the dimensions of Shakur's cell and argue that there is sufficient room for Shakur to perform calisthenics, run in place or do sit-ups or push-ups.  Shakur does not dispute this fact.  He provides no evidence showing that he was unable to exercise in his cell or by walking around the perimeter of the dayroom on days when he could not go outdoors.  Nor does he provide evidence that, as a result of

the alleged denial of exercise and recreation, he suffered any physical harm. Defendants, on the other hand, have provided the affidavit of Dr. Blanchette, who has observed no physical deterioration.  *See* Defs' Mem. Attachment P.  Thus, the court concludes that Shakur fails to meet his burden of providing evidence to create a genuine issue of material fact on the objective component of the deliberate indifference standard.  *See Martin v. Tyson*, 845 F.2d 1451, 1456 (7th Cir. 1988) (per curiam)(holding that denial of outdoor recreation for four months not unconstitutional where inmate posing escape risk had ample opportunity to exercise in his cell and restriction was based on legitimate penological concern).

Requiring Shakur to shower during one of his recreation periods is also not a constitutional violation.  *See McNamara v. Marcial*, No. 3:96cv1141(HBF) (D. Conn. Aug. 16, 1999) (holding that requiring inmates to make telephone calls and shower during one hour per day recreation period did not violate the Eighth Amendment)(Defs.' Mem. Attachment R); *Hargrove v. Henderson*, No. 95-1601-CIV-T-17A, 1996 WL 467516, at *9 (M.D. Fla. Aug. 13, 1996) (holding constitutional prison requirement that inmates shower, use telephone and exercise during one hour out-of-cell time per day).

In addition, requiring all inmates in the facility to return to their cells whenever a code is called is a legitimate penological interest.  Shakur contends that such action is required only for emergency codes, such as an altercation.  Defendants state, and Shakur does not dispute, that inmates greatly outnumber staff.  The court affords great deference to decisions of prison administrators regarding institutional order, security and discipline.  *See Bell v. Wolfish*, 441 U.S. 520, 547 (1979).  When a code is called, it may not immediately be clear whether assistance might be required from other parts of

11

the facility.  A seemingly routine matter could easily escalate if inmates in the area fail to cooperate with staff orders.

Shakur has not shown that these practices are unreasonable or unrelated to penological concerns.  He does not, for example, provide any evidence regarding the frequency of the codes or the number of correctional staff required to handle the various calls.  The court concludes that Shakur has failed to meet his burden of demonstrating a genuine issue of material fact regarding shortened recreation periods when codes are called.

Also, the denial of recreation for all inmates in the facility for a limited time following an inmate assault on a female correctional officer is a legitimate penological decision.  *See, e.g., Knight v. Armontrout*, 878 F.2d 1093, 1096 (8th Cir. 1989) (holding that denial of all recreation for short period during emergency lockdown is not unconstitutional).  Defendants' motion for summary judgment is granted on the claims relating to recreation.

### 2.    Conditions of Confinement in Q-Unit

Shakur's confinement in Q-unit lasted ninety days.  During this time, he was required to eat in his cell and receive medical attention in the unit.  Religious services and other programs were provided in the unit, instead of with inmates in the main building.  The toilet in the cell could not be flushed more than twice every fifteen minutes.

Shakur provides no authority for his claim that these conditions constitute "cruel and unusual punishment."  Prisoners have no right to be housed in what they would consider "comfortable surroundings."  Restrictions do not violate the Eighth Amendment

12

unless they are "totally without penological justification," "grossly disproportionate," or "involve the unnecessary and wanton infliction of pain." *Rhodes v. Chapman*, 452 U.S. 337, 346 (1980) (internal citations omitted).  Restrictive conditions are part of the penalty criminal offenders pay for their crimes.  *Id.* at 347; s*ee, e.g., Smith v. Copeland*, 87 F.3d 265, 268 (8th Cir. 1996) (allegation that pretrial detainee was subjected to raw sewage for four days because of inoperative toilet did not rise to level of constitutional violation); *Allebach v. Sherrer*, No. Civ. 04-287, 2005 WL 1793726, at *3-*4 (D.N.J. Jul. 27, 2005) (holding that denial of running water, religious items, visitation, recreation, use of the telephone, mattress and clothing for thirty-six days did not violate the Eighth Amendment).

Shakur also contends that his cell was searched when he left for recreation. Although he alleges that his cell was searched daily, he provides no evidence showing the frequency of the searches.  The defendants state that they conducted periodic searches as authorized under department policies.

Convicted prisoners have no privacy rights in their cells.  *Willis v. Artuz*, 310 F.3d 65, 69 (2d Cir. 2002).  Even a search serving no purpose relating to institutional security is not actionable.  *See Hudson v. Palmer*, 468 U.S. 517, 526-28 (1984) (finding search constitutional despite allegation that search was conducted solely for harassment). Shakur fails to establish a cognizable claim regarding the cell searches.

The court concludes that Shakur has not demonstrated a genuine issue of material fact on his conditions of confinement or cell search claims.  Defendants' motion for summary judgment is granted on these claims.

13

B.     **First Amendment Claims**

Shakur references the First Amendment in his amended complaint.  The court

assumes that the First Amendment claim relates to the requirement that he attend

congregate religious services in Q-Unit rather than in the main building.

Although inmates are not entitled to the full panoply of rights guaranteed under

the United States Constitution, including the First Amendment, the free exercise clause

does afford inmates at least some measure of constitutional protection, including the

right to participate in congregate religious services.  *See Pell v. Procunier*, 417 U.S.

817, 822 (1974); *see also Salahuddin v. Coughlin*, 993 F.2d 306, 308 (2d Cir. 1993) ("It

is well established that prisoners have a constitutional right to participate in congregate

religious services.") (citing cases).

Prison regulations imposing burdens on an inmate's free exercise of his religion

satisfy the requirements of the First Amendment if the regulations are reasonably

related to a legitimate penological interest.  *O'Lone v. Estate of Shabazz*, 482 U.S. 342,

349 (1987).  Thus, the court must consider the rights of the inmates and the legitimate

interest of prison officials in maintaining institutional security.  *Id.* at 348.  The regulation

must substantially burden the inmate's rights.  "A substantial burden is more than a

mere inconvenience, but rather involves, for example, a situation where an adherent is

forced to modify his behavior and violate his beliefs."  *See Gill v. DeFrank*, No. 98 Civ.

785(NRB), 2000 WL 897152, at *1 (S.D.N.Y. Jul. 6, 2000) (citations omitted), *aff'd*, 8

Fed. Appx. 35, 2001 WL 388057 (2d Cir. 2001).

Shakur does not allege, however, that he was denied the ability to practice his

religion or attend congregate religious services.  He complains that congregate services

were provided for him within Q-Unit, instead of the main building.  He states both that

he could not participate in group religious services and that the services were held in a

classroom in Q-Unit.  *See* Pl.'s Mem. at 30, Doc. #73 at 42.  Defendants have provided

affidavits explaining that one of the reasons inmates are kept segregated is to provide

an incentive to modify behavior to complete the probationary period and become

eligible for a housing unit in the main building, a legitimate penological interest.  The

court concludes that Shakur has not shown that his ability to practice his religion was

substantially burdened by attending congregate services only in Q-Unit.  Defendants'

motion for summary judgment is granted as to the First Amendment claim.

**C.    Equal Protection Claim**

Shakur also contends that the conditions in Q-Unit violate his right to equal

protection of the laws because he is not housed under the same conditions as inmates

in the main building.

The Equal Protection Clause protects prisoners from invidious discrimination.

This provision does not mandate identical treatment for each individual; rather it

requires that similarly situated persons be treated the same.  *See City of Cleburne v.*

*Cleburne Living Ctr.*, 473 U.S. 432, 439-40 (1985).  To prevail on an equal protection

claim, Shakur must prove that he was treated differently from other similarly situated

individuals and the reason for the different treatment was based on "'impermissible

considerations such as race, religion, intent to inhibit or punish the exercise of

constitutional rights, or malicious or bad faith intent to injury a person.'"  *Diesel v. Town*

*of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000) (quoting *LeClair v. Saunders*, 627 F.2d

606, 609-10 (2d Cir. 1980)).  Shakur presents no evidence showing racial

15

discrimination, intent to inhibit his exercise of any constitutional right or any malicious intent to injure.

Shakur also could assert an equal protection claim on a "class of one" theory. To state a valid equal protection "class of one" claim, Shakur must allege (1) that he has been intentionally treated differently from others similarly situated, and (2) that there is no rational basis for the difference in treatment.  *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).  To prevail on a "class of one" claim, Shakur must allege an "extremely high" level of similarity with the person to whom plaintiff is comparing himself.  *Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005).  Plaintiff's circumstances must be "prima facie identical" to the other person's.  *Id.* at 105.  Shakur has identified and presented evidence of no other inmates with similar disciplinary history who were treated differently under the same circumstances.  Thus, he fails to state an equal protection claim.[3]  Defendants' motion for summary judgment is granted on any equal protection claim.

---

[3]  Shakur states in his memorandum that defendants' motion for summary judgement should be denied as to his equal protection claim because defendants failed to respond to his discovery requests and refers the court to an objection and request for sanctions he filed in October 2008.  Shakur's motion of objection and request for sanctions regarding properly served discovery requests was denied on January 23, 2009.  *See* Doc. #74.

In the objection, Shakur acknowledged that the discovery period ended in August 2008, but complains that the defendants did not respond to additional discovery requests he served in September and October 2008.  The fact that he did not initially serve 25 interrogatories on a party does not entitle Shakur to serve additional interrogatories after the close of discovery.  In addition, the fact that the court granted an extension of time for defendants to respond to outstanding discovery does not reopen the discovery period and enable Shakur to serve new discovery requests.

**D.   State Law Claims**

Shakur references the Connecticut Constitution in his amended complaint. Defendants argue that the court should decline to exercise supplemental jurisdiction over those claims.

Where all federal claims have been dismissed, the court may decline to exercise supplemental jurisdiction over state law claims.  *See* 28 U.S.C. § 1367(c)(3); *Giordano v. City of New York*, 274 F.3d 740, 754 (2d Cir. 2001) (collecting cases).  The court has granted defendants' motion for summary judgment on all federal law claims.  Thus, the court declines to exercise supplemental jurisdiction over any state law claims.

**IV.   <u>Conclusion</u>**

Defendants' motion for summary judgment [**Dkt. #64**] is **GRANTED**.  The court declines to exercise supplemental jurisdiction over any state law claims.  The Clerk is directed to enter judgment and close this case.

**SO ORDERED.**

Dated this 15th day of July 2009, at Hartford, Connecticut.


/s/ Christopher F. Droney
Christopher F. Droney
United States District Judge

17